1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Maxine M. Chesney, District Judge

4

5   JULIA GREENFIELD,                )
                                     )
6            Plaintiff,              )
                                     )
7   vs.                              )   No. C 21-09296-MMC
                                     )
8   CROSS RIVER BANK,                )
                                     )
9            Defendant.              )
    _____)
10
                                 San Francisco, California
11                               Friday, March 17, 2023

12
    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 11:00 - 12:13 = 73 MINUTES

14  APPEARANCES:

15  For Plaintiff:
                                 Parasmo Lieberman Law
16                               7119 West Sunset Boulevard
                                 Suite 808
17                               Los Angeles, California 90046
                                 (646) 509-3913
18                         BY:   GRACE E. PARASMO, ESQ.

19                               Preston Law Offices
                                 4054 Mckinney Avenue
20                               Suite 310
                                 Dallas, Texas 75204
21                               (972) 564-8340
                           BY:   ETHAN M. PRESTON, ESQ.
22

23

24

25

2

1 APPEARANCES:   (cont'd.)

2 For Defendant:

                              Manatt, Phelps and Phillips,
3                               LLP
                              2049 Century Park East
4                             Suite 1700
                              Los Angeles, California 90067
5                             (310) 312-4283
                         BY:   SCOTT M. PEARSON, ESQ.
6
                              Manatt, Phelps and Phillips,
7                               LLP
                              1050 Connecticut Avenue,
8                               Northwest
                              Suite 600
9                             Washington, DC 20036
                              (202) 624-3337
10                       BY:   JOSEPH REILLY, ESQ.

11 Transcribed by:          Echo Reporting, Inc.
                         Contracted Court Reporter/
12                         Transcriber
                          echoreporting@yahoo.com
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  Friday, March 17, 2023                                11:00 a.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4            THE CLERK (via Zoom):  Calling Civil Action C

5  21-9296, Julia Greenfield versus Cross River Bank.

6       Counsel, please state your appearances for the record,

7  somebody.

8            MR. PEARSON (via Zoom):  You're on mute, Grace.

9            MS. PARASMO (via Zoom):  Grace Parasmo on behalf

10 of Plaintiff Julia Greenfield.

11           THE COURT:  Okay.  Thank you.

12           MS. PARASMO:  And I have with me my colleague,

13 Ethan Preston, but I will be doing the speaking for

14 Plaintiff.

15           THE COURT:  Interestingly -- okay.  Fine.  Yes.

16 He's not on the screen, but he's welcome to become visual.

17 All right.

18           MR. PEARSON:  Good morning, your Honor.  Scott

19 Pearson and Joseph Reilly for the Defendant.

20           THE COURT:  Are you going to take the lead on

21 behalf of your client, Mr. Reilly -- or Mr. Pearson?

22           MR. PEARSON:  I'll take the lead, your Honor.  I

23 may need Mr. Reilly to chime in from time to time, depending

24 on where this goes.

25           THE COURT:  Okay.  Well, let me just flip through

4

1 this.  First of all, you didn't give me a chambers copy.

2 That's why you're getting called second.  Okay?  Because the

3 other people did.

4      On any given day, maybe everybody would give me a

5 chambers copy.  Then I'll have to figure out some other

6 factors that may bear in the judge's determination of the

7 call, such as who we expect to be short, and that doesn't

8 always pan out, anyway.

9      Then there are some people that give us a statement,

10 and a chambers copy, but they don't put the date and time on.

11 So there are a million things people could do wrong where you

12 could still excel, but you've got to start by giving me a

13 chambers copy, which, again, you didn't do.

14      Okay.  So, just going through this, of course,

15 everybody was thinking, "I'll just file any motion that

16 possibly is available under the rules."  Okay.  Now, let's

17 see.  We have this question about this individual claim, so

18 let's go back over that for a moment, et cetera.  I just want

19 to check one thing here.  I've got a bunch of things written

20 here.  Now I can't read my own writing.

21      There are a couple of things that Defendant -- do you

22 want me to call them "Cross River" or "CRB"?  You seem to

23 like "CRB."

24           MR. PEARSON:  Either way, your Honor.  I actually

25 ordinarily refer to them as "Cross River," but whatever you

5

1 prefer.

2       THE COURT:  Okay.  It's almost easier to say, so

3 I'm going to go with "Cross River," just for these purposes.

4 It may be easier to write "CRB."  So I'll say, "Cross River."

5 Okay.

6       MR. PEARSON:  I was just going to say, your Honor,

7 I think, given the page limits for the joint statement, we

8 may have elected to use "CRB" to save some space.

9       THE COURT:  It's fine.  I think it's typical of

10 any kind of brief that they're filing.  If you use initials,

11 that's fine, but I'm going to say, "Cross River," because

12 it's easier.  It's actually easier to say than "CRB."

13       Now, there's this whole idea about discovery, and it

14 goes to certain issues that Cross River thinks may bear just

15 on whether this Plaintiff has a claim, and then, if she

16 doesn't, then Plaintiff's counsel says, "Okay.  Fine.  We'll

17 just throw in another Plaintiff.  We've got a bunch of them

18 standing in line here.  We'll just find another one."

19       Maybe they can, but let's discuss for a moment where

20 you want to go with this, because part of it would apply to

21 any plaintiff, and that's the question of whether or not

22 these applications are evaluated strictly by way of some

23 computerized program, without any human looking at them

24 individually.  I'm not sure if the Plaintiff's position is,

25 if you use a program at any point, you're out of luck, or

6

1 whether they are agreeing with the Defendant, which I think

2 the Defendant is saying, "It's okay if we use it at some

3 point as long as, ultimately, we get a human involved."

4       Now, is there a dispute, legally, about that?  Because

5 I don't, frankly, know the law on this particular area, on

6 that point, at least.  Does anybody have any thoughts on

7 that, whether, if you're using a computer at all, you know,

8 it's not proper?

9             MR. PEARSON:  Your Honor, I think that this issue

10 comes up in the context of whether a class could be certified

11 in this case, as opposed to the underlying merits claim.

12             THE COURT:  Well, but what about my question,

13 irrespective of what you want to do with it?

14             MR. PEARSON:  Yes.  I'm sorry, your Honor.  I was

15 on my way to that.

16             THE COURT:  Okay.  Let's get there right off the

17 bat.

18             MR. PEARSON:  Sure.

19             THE COURT:  Then you can back off and drive back

20 wherever you were going.

21             MR. PEARSON:  Sure.  Well, I think I need to

22 explain a little bit in order to answer your question

23 directly, your Honor.  If I could have just a little bit of

24 leeway, I promise this won't take long.  The underlying

25 merits claim is that, you know, when someone -- when an

7

1 application for credit is denied, there is a requirement,
2 under certain circumstances, to send an adverse action
3 notice, and the Plaintiff's claim is that the reason for
4 credit denial, which was incomplete application, you know,
5 was incorrect, basically, because her application was, in
6 fact, complete, and this whole issue of automation of the
7 intake process, the application process, goes to the question
8 of whether or not you can make that decision as to -- on a
9 class-wide basis, as opposed to one by one.
10      In terms of the facts, you know, there has -- we have
11 not provided discovery to the Plaintiff yet on this issue,
12 but, factually, the Plaintiff's application was not
13 determined solely, you know, in automated fashion, and, in
14 fact, it was incomplete, and, in fact, that was determined
15 manually, and that is true of many other, you know, putative
16 class members as well.
17      THE COURT:  That's just a bunch of facts.  You
18 haven't answered my question as to the law, and I'm assuming
19 it's not favorable to you, or you would have answered it
20 already.
21      MR. PEARSON:  Your Honor, I'm sorry.  Maybe I
22 don't understand your question, then.
23      THE COURT:  My question was just, as a matter of
24 law, is anybody saying, if you have an automated process at
25 any stage of this evaluation, that it's an improper way of

8

1 proceeding, and somehow gives rise to liability, or is it
2 that it's okay if you have it at point A as long as, at point
3 B, you get a human being involved, or do we need humans at
4 all?  I'm not sure what you're saying the law is.

5          MS. PARASMO:  Your Honor, I can answer that.

6          THE COURT:  Great.  Okay.  What do you think?  And
7 I'll see if he disagrees.  We'll take it from the Plaintiff's
8 standpoint.

9          MS. PARASMO:  The answer to your question is that,
10 if you're using artificial intelligence, a completely
11 automated system, to make the decision in the underwriting
12 process, and if the bank doesn't know what the true reason
13 for the decision is, and here, if they don't know true
14 reason, then that would actually -- that would give rise to
15 liability.  But here we're not limited, and I can explain
16 just that theory.

17          THE COURT:  Well, wait, wait, wait.  They say they
18 got people involved.  They had a computer that makes some
19 kind of initial cut of some sort, looks at it, and I don't
20 know what factors they plugged into it, but, on a superficial
21 basis of some sort, the computer makes the first cut, and it
22 goes, "Okay.  You people are okay.  You people aren't."
23 Okay.  Then it takes the okay people, the company does, the
24 Defendant, takes the okay people and it then does a more
25 thorough check, and it says, "No, sorry, you're not."

9

1     Okay.  That's what it sounds like is going on here in
2 some way.  If it isn't what's going on, I want to ask Mr.
3 Pearson if there's something else that you would say is
4 happening here.
5          MR. PEARSON:  No, I think that's a fairly accurate
6 description, your Honor.
7          THE COURT:  Fine.  Okay.  Great.  Let's stop there
8 for a minute.  Then the question is -- and now I'll pose it
9 again -- assuming this is the actuality, all right, "As a
10 cost-saving device, we use a program to start with, and we
11 weed out the people that are really bad, leaving the people
12 who might be okay.  We're going to look at it," and then they
13 do, and they tell whoever it is, "All right.  You know, we've
14 taken another look, and this does work."  All right.
15     Now, is it the Plaintiff's position that if that is
16 what's going on, that that, nonetheless, is not a lawful way
17 of acting under whatever laws are applicable here?
18          MS. PARASMO:  Your Honor, I can't answer that,
19 because that hypothetical doesn't square with what happened,
20 in the sense that --
21          THE COURT:  All right.  Then I would assume that,
22 if that is what happened, you would say, "Okay.  That would
23 be all right."  But you are taking the position that
24 something else happened.
25          MS. PARASMO:  Please don't assume that.

1          THE COURT:  Well, I am.

2          MS. PARASMO:  If you could repeat the

3 hypothetical, then, because I didn't understand.

4          THE COURT:  Well, it was pretty straightforward.

5 All right?

6          MS. PARASMO:  If you could repeat it?

7          THE COURT:  If a company uses a computer to make

8 the first cut, and then it takes a look at who's left to

9 determine whether or not they're really qualified, or they've

10 really given a full, complete application --

11          MS. PARASMO:  So, if they --

12          THE COURT:  -- and not qualified --

13          MS. PARASMO:  If you use the --

14          THE COURT:  Do not speak when I am.  The last case

15 that I had --

16          MS. PARASMO:  I'm sorry.

17          THE COURT:  -- I had one lawyer that did nothing

18 but overlap.  It drove me crazy, and if you do it, I'm going

19 to really be even madder, because it's going to have happened

20 twice.  Okay?  All right.

21      Now, here's the hypo.  You have it.  All right?  Are

22 you saying the law doesn't allow you to use a computer at any

23 point?

24          MS. PARASMO:  No, your Honor.

25          THE COURT:  Okay.

1           MS. PARASMO:  What we're saying is that if the

2 first cut -- if that first cut, the computer then spits out a

3 denial at that first cut, and then CRB goes and there's an

4 after-the-fact determination that it was incomplete, when it

5 already denied it and gave an adverse action notice, then

6 that would be -- that's where reliability flows.

7           THE COURT:  I thought that first -- I thought the

8 allegation is the computer said, "You guys are great.  Thank

9 you very much" --

10          MS. PARASMO:  No, it's --

11          THE COURT:  -- and then they went the other way,

12 the people then did a reverse, they did a 180 on it.  In

13 other words, originally the class is all told, "You are

14 complete."  Is that what --

15          MS. PARASMO:  I'm sorry.  You're saying that

16 the -- okay.  What we're saying is that the application goes

17 through, and you get an "Application complete" because you

18 filled out all the requirements that CRB" --

19          THE COURT:  Who knows?

20          MS. PARASMO:  Well, that's --

21          THE COURT:  You then thought they were fine,

22 right?  Computer thought they were fine.  Humans thought they

23 weren't.  That's your -- and then you say, "Well, you can't

24 do that"?

25          MS. PARASMO:  Uh-huh.

1          THE COURT:  Okay.

2          MS. PARASMO:  I understand.

3          THE COURT:  Okay.  So the theory is, you can't

4  change your mind, right?

5          MS. PARASMO:  The theory is, is that once an

6  adverse action notice is provided, that you can't then go

7  back and figure out the true reason in an after-the-fact

8  determination, because here CRB is saying there was fraud.

9          THE COURT:  That's a separate issue.  I'm not even

10 getting to that point yet.  All right?  Because, on a

11 class-wide basis, I'm going to assume most of the people

12 didn't lie.  I'm going to find out from Mr. Pearson what he

13 says a lie is, but leave that out.  That's separate.  Okay?

14     As I understand it, if you just -- I thought they

15 wanted to look at her claim, and they're saying, "We want to

16 look at her, and if we can get rid of her, then that's the

17 end of the case," and then you say, "Well, plug in another

18 plaintiff."  Okay.

19     That's why they wanted to narrow it, because they had

20 her case and they had a fraud allegation as well, which we'll

21 go into, but I just wanted to see whether there's value in

22 going into her case alone or not, because, if they could

23 simply describe, "This is what -- these are the depositions

24 we want to take" -- they actually don't want to do anything.

25 They want to give you stuff.  Okay?

1      Then they say, "After we give you all this stuff, then,
2  once you have it, we're going to move for summary judgment
3  early, and we want to be able to do it just on that limited
4  issue, and then come back later, if we have to, and file
5  another motion," which I may or may not let them do.

6      So I'm trying to figure out -- because you said, "Up to
7  now, we can't figure out how they're going to put parameters
8  on the discovery that they want to do," and if that's true, I
9  agree with you that we should not limit in the way they're
10 asking, because it creates nothing but fights, and then you
11 get everybody in front of the magistrate judge saying, "It's
12 in the box."  "No, it's not."  "It's out, it's in," "Did,
13 too, did not."

14     So we can't have that.  I agree.  But that's why I'm
15 trying to find out, because what I read from the statement,
16 contrary to what Mr. Pearson said a moment ago, or quite a
17 few moments ago, regarding he's really focusing on the class,
18 that may be coming up, but, if he were, then we don't want to
19 limit discovery in the way he wanted to, because he just
20 wants to look at her.  Okay?  And if you're looking at her,
21 you're not looking at the class, per se.  You're looking at
22 her.

23             MS. PARASMO:  May I be heard one --
24             THE COURT:  Sure.  Go ahead.
25             MS. PARASMO:  So the notice, the adverse action

14

1  notice, is an e-mail, and there's actually two e-mails, with

2  a group of PPP -- a group of applicants that are all listed

3  and identified as having -- and it says that "The automated

4  system denied your application."

5          THE COURT:  I thought it said it granted it.  This

6  is why I'm totally thrown off by what you're saying.

7          MS. PARASMO:  I could explain it.  I could explain

8  the chronology, if I may.

9          THE COURT:  Yes.  Okay.  Go ahead.

10         MS. PARASMO:  Okay.  So, when applicants go to the

11 CRB portal, they submit all of their information, and what

12 information that CRB is asking, okay, and then they get an

13 "Application complete" message.  Okay.  Then CRB makes a

14 decision, and that decision that we have is a group of

15 applicants who got denied -- some are together as a group --

16 by the automated system, not just the Plaintiff.  So there is

17 a class here.  There is a class.

18         THE COURT:  They got denied by the automated

19 system, is what you're saying, and let me check with Mr.

20 Pearson.  Were there two automated messages?

21         MS. PARASMO:  Yes.

22         THE COURT:  Maybe that's where I'm getting thrown

23 off.

24         MS. PARASMO:  Yes, yes.

25         THE COURT:  I'm asking him, Mr. Pearson.

15

1          MS. PARASMO:  Sorry.

2          THE COURT:  Mr. Pearson, is it your understanding

3 as well there were two automated messages, or one automated

4 and one person, or two automated and a third that's a person?

5          MR. PEARSON:  Your Honor, when people would go

6 onto the portal to submit their application documents, if

7 they submitted all of the documents that they were required

8 to, they would get a message saying that "Your application is

9 complete."  Imagine, if you will, that those documents have

10 to be filled out.  Imagine that maybe one of the documents

11 wasn't completely filled out, you know, section five was

12 blank.

13          THE COURT:  Yes.  Okay.  That's what I figure.

14 Then what happens?  Did they then get another message from

15 the computer, they get one from one of your people?  Why is

16 this so hard to follow?

17          MR. PEARSON:  Well, your Honor, because it is not

18 true that you can determine this in any other way that

19 reviewing each --

20          THE COURT:  I don't care what you need.  I'm only

21 asking what you did.  In other words, I can't get a straight

22 answer here.

23          MR. PEARSON:  I'm sorry, your Honor.  There is an

24 automated process, followed by a manual process, if triggered

25 by the automated process.

1        THE COURT:  Yes.  That's what I understood to

2 start with.

3        MR. PEARSON:  Yes.  Sorry.

4        THE COURT:  Okay.  But Ms. Parasmo is saying that

5 there were two automated, one okay and one not -- one that

6 said, "You're fine" and one that said, "You're not," and so

7 it -- but there's no third message sent out to these people,

8 right?  They only get two.  They either get one good and one

9 bad from the computer, or they get one good and one bad

10 coming from people.  All right.

11    Assuming that's the case, okay, why are you shaking

12 your head?  You told me there were two, Mr. Pearson.  What's

13 wrong with what I just said?

14        MR. PEARSON:  Your Honor, I'm just not clear on

15 what these two separate messages that Ms. Parasmo is

16 referring to are.  I'm sorry.  I just -- maybe Mr. Reilly

17 knows, but I don't understand what she's saying.  There was

18 one adverse action notice provided.

19        THE COURT:  All I can tell you is that it sounds

20 like the people in this group, including the named Plaintiff

21 here, all right, initially got a message that said, "Thanks a

22 lot for your stuff.  This is complete in some way."  I don't

23 know exactly what the words were, "Application complete,

24 thank you," or what have you, and what you're saying is it

25 looks for documents, it doesn't look for the content, per se.

1       Okay.  Then a person looked, gets these documents and
2  goes through them, and says, "Okay.  You gave us A, B, C, D,
3  and E.  Four of those five are completely filled out, and the
4  fifth one has got a bunch of blanks that we needed filled
5  out, and so it's not complete," and then they tell them.  It
6  sounds like there's a dispute about whether actual people
7  made that second determination.
8       Frankly, I read the papers, and the case, as far as the
9  complaint went, and it sounded like there were two messages
10 given to these people.  I don't care whether you call them
11 "adverse action notices."  I don't care whether you call them
12 "love letters."  Whatever they were, two things were sent
13 out, and the Plaintiff's understanding is a computer did
14 both.  First it said, "Okay," then it did an about-face and
15 cranked out, "Sorry, Charlie."
16      Okay.  And according to the Defendant, that's
17 incorrect, and they are prepared to provide whatever
18 discovery the Plaintiff says they want, because it's all in
19 the hands of the Defendant.  Defendants aren't really
20 discovering from the Plaintiffs so much.  They are handing
21 stuff over, "Here's Harry Smith.  Harry took this thing and
22 he went through it," however they're going to show it to you,
23 and then you decide, Ms. Parasmo, whether they've really
24 given you sufficient evidence to show that a person made that
25 second determination.  Okay.

1          MR. PEARSON:  Your Honor -- I'm sorry.

2          THE COURT:  No.  Okay.  And?

3          MR. PEARSON:  I was just going to say thank you.

4 I now understand what you're asking.  Yes, there were two

5 different messages.

6      The first one is, when someone is entering information,

7 entering the application into the computer, there would be an

8 automated response from the computer saying, "Thank you for

9 submitting your application," basically, and there was

10 language about the application being complete in that

11 message.

12      Then the bank does its underwriting, and decides

13 whether or not it is going to make the loan, and then there

14 is a message sent out, if the application is denied, saying,

15 "This is why your application was denied."

16          THE COURT:  Okay.  And I had asked at the very

17 beginning, assuming, arguendo or otherwise, that is what

18 happens, is the Plaintiff saying that's wrong in some way,

19 because you used a computer at step A and not a person at

20 step A, or is the Plaintiff's position if you actually did

21 that, that might be okay, but you didn't do it that way?  And

22 then I didn't get a response.

23      Frankly, this is not -- I'm not taking this on myself

24 as being unclear as to what my question was.  Pretty simple

25 from the start.  Okay?  And I could not get a straight answer

19

1 from anyone.  So I'm going to assume for the moment that if
2 you did it the way you said you did it, Mr. Pearson, or your
3 client, that that would not be improper, okay, just for
4 discussion, because otherwise why bother to go through it?
5     So let's say you turn over a bunch of stuff.  The
6 Plaintiff looks at it, and they said, "You know, this really
7 doesn't do it for us."  Okay.  Fine.  They can continue to
8 pursue their point that humans didn't get involved.  But, if
9 they look at it and they say, "It looks like they did," then
10 I don't know where that goes for the case.  Okay?
11     As far as the fraud that's been mentioned, "Fraud,
12 fraud, fraud," what is, specifically, the misstatement that
13 you say she made, or misrepresentation, knowingly, trying to
14 get the loan by making this false statement?  What is it?
15          MR. PEARSON:  Fake documents were submitted.
16          THE COURT:  And by those, you say these are false
17 documents reflecting something that was needed.  What would
18 these be?
19          MR. PEARSON:  Tax documents and things like that
20 that were not the actual tax documents, and were not --
21          THE COURT:  You mean like a tax return?
22          MR. PEARSON:  Correct, your Honor, and Mr. Reilly
23 can provide better detail on exactly what each item is, but,
24 generally speaking, what we're talking about is submitting
25 false and doctored documents to obtain a

20

1 government-guaranteed loan.

2          THE COURT:  All right.  I won't ask him, because I
3 don't want you to tag-team up at the moment on Ms. Parasmo.
4 All right?  I got the picture, and I think she does, too.  So
5 the question is, what have you got to show it?  And you would
6 present that as well.

7      Now, if you were then satisfied, and Ms. Parasmo was
8 satisfied, that whatever discovery that would be produced was
9 produced on those issues, the first being "Did humans get
10 involved in making the cut at the second step?," and, in any
11 event, even if they did something wrong, she's got unclean
12 hands here, she's got fraud, wherever it fits into the legal
13 analysis, by submitting false documents, so now you have it,
14 and it either plays out one way or the other, and you think
15 it plays out in your favor, Mr. Pearson, and then you bring a
16 motion solely related to her?  Is that right?

17          MR. PEARSON:  Your Honor, we have two motions in
18 mind.  One is a summary judgment motion with respect to the
19 Plaintiff's individual claim, on the merits.

20          THE COURT:  Okay.  Yes, yes.  Okay.

21          MR. PEARSON:  The second is really a follow-on to
22 the motion practice we had at the beginning of the case
23 striking the class allegations.  Your Honor gave Plaintiffs
24 leave to amend their complaint to allege this new theory
25 based on automation, and the proposed class representative,

21

1 the Plaintiff, you know, that's not what happened with her.

2          THE COURT:  Well, she's out.  All right.  So she's

3 out.

4          MR. PEARSON:  Right.

5          THE COURT:  The class is out, too, because, at the

6 moment, there's no complaint.

7          MR. PEARSON:  Right.

8          THE COURT:  And if they would ask to substitute

9 the next person who's standing in line, if they've got one,

10 would you -- what would your response be?  Let's say you won

11 your motions.  Well, you didn't win the class motion yet.

12 You won her out.  Okay.  And what you're saying is the class

13 is all out, too, because they're losers, but, of course,

14 that's not the test for class action.  You can have a losing

15 class.  Okay.  So what you're really saying is the whole

16 class is a bunch of losers.

17          MR. PEARSON:  No.

18          THE COURT:  But just talking about her, okay --

19 because you're saying they all go in the same boat as a big

20 loser class, because people got involved.  Okay.

21          MR. PEARSON:  No, that's not what I'm saying, your

22 Honor.

23          THE COURT:  They could be a class.  They'd just be

24 a bunch of losing class members.

25          MR. PEARSON:  No, that is not what --

1          THE COURT:  Well, it sounded like it.

2          MR. PEARSON:  No.  Your Honor, what we're saying

3 is that the only way to determine whether each person has a

4 claim or not is to review their own file and see what

5 happened with their particular situation.  There is no way to

6 do this on a class basis, because it's all --

7          THE COURT:  That may be true.  Okay.  But we'll

8 stop you on that.  Okay.  So that is separate and distinct

9 from the question that applies to her specifically with the

10 fraud.  Okay?

11     There's an over-arching defense that you have that we

12 have people involved, and because people are involved, we

13 have to look at each one of these after they get the sort of

14 step one okay, "You gave us the papers.  Now we're going to

15 look at what they say."  And you may be right about that,

16 but, first, which do you want to do first, or do you plan to

17 just file these things simultaneously, or what's your thought

18 on that?

19          MR. PEARSON:  Well, your Honor, I think we had

20 contemplated filing a class-related motion at the same time

21 we sought summary judgment on the individual claim, but we

22 would be fine just focusing on the individual claim for now.

23          THE COURT:  Well, the problem -- I'm sorry.  I

24 didn't mean to interrupt you.  Keep going, and then I'll tell

25 you what my thought is about the class and the individual as

23

1 it affects discovery.  Okay.

2          MR. PEARSON:  You didn't interrupt me, your Honor.

3          THE COURT:  Okay.  So I thought I was doing a

4 "Parasmo" here.  Okay.  That's okay.  Well, all right.

5     So, getting back, getting back for a moment, because

6 you want to limit discovery, if you're going to file a motion

7 that you need whatever individual review for class -- you

8 can't have a class certified -- it tends to expand the

9 discovery beyond what might be very limited if you're just

10 looking at her.

11     So, if you were just looking at her, and you could

12 indicate or articulate what the boundaries of that discovery

13 would be -- and it's not really what you're trying to get.

14 It sounds like what you would be giving.  What would you be

15 getting in discovery, do you think, Mr. Pearson?

16          MR. PEARSON:  Well, the discovery that we've been

17 seeking, your Honor, relates primarily to the fraud claims.

18 You know, there are some other things, you know, that we

19 sought as well, but that's the focus of our discovery.

20     I think, realistically, you know, we've already

21 provided the Plaintiff with some information about, you know,

22 her particular loan, but, you know, there's some additional

23 information that they can obtain regarding that, and they

24 can -- you know, if they want to take a deposition and, you

25 know, talk to the people who were involved in this process to

24

1 understand that it didn't really work the way that they've

2 alleged.

3     You know, it seems to me that would be a streamlined,

4 quick way of potentially resolving the case, and would make a

5 lot of sense, and then we can do the other stuff if that

6 doesn't work out the way that we think it will.

7          THE COURT:  So, if you were -- you would be

8 asking -- because, if the case kept going -- right now I have

9 a single summary judgment motion rule, and what you would be

10 filing vis-a-vis the named Plaintiff would be a summary

11 judgment motion based on, I suppose, both this class-wide

12 issue of humans getting involved, and, two, even if they

13 didn't cheat, has a fraudulent application, correct?

14          MR. PEARSON:  Yes.

15          THE COURT:  Okay.  And, I mean, you could have

16 both going simultaneously, or you could have "even if," but

17 it would all be just limited to her.

18          MR. PEARSON:  That's the idea, your Honor, yes.

19          THE COURT:  All right.  Then I would be

20 inclined -- I won't make a final decision on this at the

21 moment.  Okay?  But I'd be inclined to give you one extra

22 motion, i.e., the motion as to her own claim, given what you

23 said about the fraud, and then as well as what actually goes

24 well beyond her, which is just the heart of what you think

25 the Plaintiff's, in general, claim is, not just individually,

1 that there was a wrongful action taken at least as to this

2 group.

3      How big -- there's one guy that what, kind of filed all

4 these things on behalf of these people?  Are they some kind

5 of limited subclass, or what are we talking about here?  I

6 want to go back to Ms. Parasmo on that.

7           MS. PARASMO:  My understanding is that there was

8 one individual that submitted an application on behalf of

9 dozens of individuals, PPP loan applicants, and that

10 individual received a batch, a group denial, adverse action

11 notice.

12           THE COURT:  Okay.  One notice went out as -- how

13 many people are we talking about, this group?

14           MS. PARASMO:  It might be 60.  I'm not sure,

15 right?

16           THE COURT:  Okay.

17           MS. PARASMO:  I don't have the number.

18           THE COURT:  What about all the other people in the

19 class that -- you would say their experience would be the

20 same?  Is that it?

21           MS. PARASMO:  Yes, because, to answer the question

22 that you actually asked me earlier, because now I understand

23 the question better, the manual -- and I apologize.  The

24 manual review -- just because there would be some sort of

25 manual review, that wouldn't negate the liability if it

26

1 wasn't related to the underwriting of the loan and the
2 decision process of what is considered in determining that
3 it's complete or incomplete, or that it fits the criteria for
4 granting credit.
5      So it would depend, really, on CRB's practices,
6 general -- their actual practices, and what they regularly
7 do, and what they regularly obtain, and how that works.  So
8 it wouldn't necessarily -- just because there was some sort
9 of manual review, it would have to be something related to
10 underwriting.
11      THE COURT:  Okay.  And by that, what do you mean?
12 In other words, "related to underwriting" versus what?
13      MS. PARASMO:  Well, not that just somebody -- not
14 just -- it would have to be something that was deliberate,
15 that they actually looked over the application and found that
16 there was some missing material, and we believe that they do
17 this completely through, like, an -- there's an artificial
18 intelligence that is able to figure out -- to analyze
19 documents, and, you know, it's more complex than we can
20 understand, but that's the way they are able to process these
21 applications in volume, at a quick speed.
22      THE COURT:  Okay.  Your position is they don't
23 look at these individually.  They have -- once people make
24 the first cut, let's say, through the computer saying, "Thank
25 you very much," then another computer program just comes into

27

1  play?

2          MS. PARASMO:  Yes.  Yes, your Honor.

3          THE COURT:  Okay.

4          MS. PARASMO:  I'm sorry I didn't make it clear

5  earlier.

6          THE COURT:  Well, okay.  So, under those

7  circumstances, I think the question becomes what the law

8  actually requires, and what do you understand is the law that

9  applies to how these applications are reviewed?  Because you

10  have to rely on something over-arching all of this as legal

11  requirement, and what does that say?  What's the language

12  we're looking at?

13          MS. PARASMO:  So we're looking at the language on

14  Regulation B in terms of what makes an application complete,

15  and it's if something is what they regularly obtain and

16  consider in evaluating that type of loan.

17          THE COURT:  All right.  So let me stop you for a

18  minute.  That goes more to what they do, not what they have

19  to do.  What if they just did everything by plugging in a

20  bunch of people into a computer the second time, and the

21  person who does it is a human, but that's all they do?  Okay?

22  Where are you getting that they can't do that, if they did it

23  that way?

24          MS. PARASMO:  Well, the statement of the law would

25  be, in general, that if you're going to use an automated

28

1  system and artificial intelligence, you have to be able to

2  decipher the real reason that the loan was denied.  So, if

3  you can't do that, and you rely on artificial intelligence

4  and machines, and you don't know the real reason, then

5  there's liability, and we're saying that --

6          THE COURT:  Yes.  Where is that law?  In other

7  words, what does that law say, as opposed to you just saying

8  you can't do it?

9          MS. PARASMO:  So that comes from the guidance from

10 the Consumer Financial Protection Bureau, because nowadays

11 these are increasingly common, using artificial intelligence

12 to make credit decisions, and so I --

13         THE COURT:  You know, I don't care what the reason

14 is.  If somebody just told me, "This is the law," I don't

15 care why it was enacted.  I'm just trying to find out how you

16 can say, as a legal matter, they can't do what you think they

17 may be doing.  That's all.

18     I mean, look.  If you say you grab somebody's purse

19 from them, and you ran away with it, and then you say, "Okay.

20 Why can't you do that?," all right, "211 of the Penal Code,

21 robbery."  I used to do criminal things a long time ago.  You

22 never forget the code sections.  Okay.  So that would be --

23 that's what you would bring a criminal case under.

24     If you want to say you lied on your label when you said

25 there's real fruit in your Fruit Loops, okay, and somebody

1 goes, "All right.  Here's this Consumer Legal Protection Act"

2 or whatever, and you can't put false labels on things or what

3 have you, okay, they have a law.  That's a civil case.  What

4 are you relying on?

5          MS. PARASMO:  Regulation B.

6          THE COURT:  All right.  What does it say?

7          MS. PARASMO:  Let me look.  If I may look in my

8 complaint?

9          THE COURT:  Yes, you may.

10          MS. PARASMO:  Okay.

11          THE COURT:  I don't happen to have it immediately

12 handy, or I'd look at it with you, but I don't.  Any luck?

13 Still trying to find it?

14          MS. PARASMO:  I'm relying on a code of regulatory

15 guidance from the Consumer Financial Protection circular.  It

16 says that under -- "A creditor cannot justify noncompliance

17 with ECOA and Reg B requirements based on the mere fact

18 that" --

19          THE COURT:  Wait, wait, wait, wait, wait.  You're

20 reading too fast.  Just go back to the beginning, and just

21 slowly read it.

22          MS. PARASMO:  Okay.  The regulatory guidance is

23 that it prohibits creditors from using machine-learning

24 systems to deny credit applications without understanding and

25 communicating the real reason why the system denied the

30

individual application, and I quote:

      "Creditors who use complex algorithms,
      including artificial intelligence or
      machine learning, in any aspect of their
      credit decisions must still provide a
      notice that discloses the principal
      reason for taking an adverse action.  A
      creditor cannot justify noncompliance
      with ECOA and Reg B's requirements based
      on the mere fact that the technology it
      employs to evaluate applications" --

THE COURT:  That's a little too fast again.

MS. PARASMO:  Okay:

      "A creditor cannot justify noncompliance
      with ECOA and Reg B's requirements based
      on the mere fact that the technology it
      employs to evaluate applications is too
      complicated or opaque to understand.  A
      creditor's lack of understanding of its
      own methods is therefore (sic) a
      cognizable defense against liability for
      violating ECOA and Reg B's
      requirements."

THE COURT:  Okay.

MS. PARASMO:  That's what I'm relying on.

1          THE COURT:  Okay.  So I'm not sure exactly what

2   all that says.  I want to look at it again, but not --

3          MS. PARASMO:  I can read it again.

4          THE COURT:  No, don't read it again.  Okay.  All

5   right.  Let's assume that's the legal framework, and then I'm

6   assuming Mr. Pearson has read it as well, and Mr. Reilly up

7   there, and that they think that whatever they do is not just

8   humans versus computers, but that they do whatever is in

9   compliance with that.  But I want to confirm that.

10      Mr. Pearson, do you understand what the law is that the

11  Plaintiff is relying on?

12          MR. PEARSON:  Yes, your Honor.  I don't think that

13  applies to this situation.  I'm not aware, actually, of this

14  particular loan program employing any machine learning or

15  artificial intelligence at all.  I'm not certifying that to

16  the Court, because it's possible there's something I'm not

17  aware of, but what happened here did not --

18          THE COURT:  Okay.  Wait, wait, wait.  When you

19  said, "I'm not sure any of that applies," are you talking

20  about what she's relying on --

21          MR. PEARSON:  Yes.

22          THE COURT:  -- as being something that has nothing

23  to do with this particular case, or are you just saying that

24  it doesn't work here because she doesn't have a case under

25  it, because our facts are in compliance with it?  I can't

1  tell whether you're saying that's some law that has nothing

2  to do with whatever this fight is, or whether you're saying

3  that you're not violating it in any way.

4          MR. PEARSON:  Your Honor, I don't want to say it

5  has nothing to do with what we're talking about, because it

6  is an ECOA issue, but there are a lot of fintech companies

7  that are making loan decisions using these very advanced

8  artificial intelligence models that have literally hundreds

9  and hundreds of different data points that they're using, and

10  the guidance that she's referring to is basically saying,

11  "Look.  If you have some, you know, black box that is making

12  decisions, you can't say, 'Well, you know' -- you can't -- in

13  an adverse action notice, you need to explain why it was

14  denied, other than just saying, 'Well, you failed our model

15  isn't enough.'"  That's what that guidance is saying.

16          THE COURT:  Okay.

17          MR. PEARSON:  In this circumstance, though, your

18  Honor, I think what's really important, and I think what we

19  have been focused on in our discussions with the Plaintiff,

20  is that this was not an automated decision.

21      When Ms. Greenfield received her adverse action notice

22  saying that her application was incomplete, the finding that

23  the application was incomplete was not made by a computer.

24  It was made by human beings reviewing documents that the

25  computer kicked out for manual review because there were

1 issues, and it was basically something along the lines of

2 what I described earlier.  Imagine that there's five

3 documents you need to submit, and some of those documents

4 weren't filled out completely.  That's why it was incomplete.

5          THE COURT:  All right.  First of all, what Ms.

6 Parasmo read didn't sound like it precluded computers and AI,

7 but, rather, required that the explanation be clear to the

8 applicant that "Fine.  You want to do this with a computer."

9 Okay.  Swell.  But you can't then simply say, "All right.

10 Our computer said you're out of luck."  You have to explain

11 in some kind of human detail understandable to the recipient,

12 but that's different than what you can do.  It's what you

13 need to explain.

14     I understood there was something talking about what you

15 can do.  So, at this point, I may not have any of this clear,

16 but the point is that there's at least a colorable sort of

17 halfway convincing argument, let's say, by the Defendant that

18 they could, with very limited discovery, if you're just

19 looking at the named Plaintiff, have enough discovery

20 provided to everybody that they could bring a limited motion

21 for summary judgment to get rid of her claim, and if her

22 claim is, let's say, a valid exemplar, without the fraud,

23 just her claim, her base claim, can be looked at as an

24 exemplar of everybody else's.  Then there may not be -- there

25 could be a class, but it's a class that could lose.

34

1    So you might want to just be thinking down the road,

2  but it won't be yet.  Okay?  That would come about if there

3  were enough to kill her case, and there was a motion to

4  substitute along the way somewhere.  Okay.

5    So how could we -- let me see what time it is.  Yes.

6  This is a Fitbit.  Instead of telling me the time, it's

7  telling me I should get up and walk.  Well, that's not

8  helping.  Here we go.  Quarter to 12:00.  So we've been at

9  this for some time, so I'm glad I took you second, even if

10 you had given me the most perfect chambers copy ever.  And,

11 by the way, the content of your statement was fine.  It was

12 very thorough.

13   But let's go, then, to this question.  How could it be

14 boxed up so that I don't have to refer you to a magistrate

15 judge who will then hate me because -- no, I won't refer you

16 to an individual one.  I just say you're going, and then they

17 get pulled out of a big pot.  So, otherwise, they'd be very

18 unhappy that I sent you, your complicated issue here on

19 discovery.

20   So let's say that you try right now, Mr. Pearson -- and

21 if I say it doesn't work, I'll let you enlist Mr. Reilly.

22 Okay.  How would you define the limitations of the discovery

23 that you want to do for this single motion for summary

24 judgment on the Plaintiff's claim?

25       MR. PEARSON:  Your Honor, I would suggest that

1 discovery be limited to the claim brought by the individual

2 Plaintiff, and specifically the question of whether or not

3 her application was, in fact, incomplete, and how her

4 application was determined to be incomplete.

5        THE COURT:  What about the fraud?  Don't you want

6 to do that, too?

7        MR. PEARSON:  We can, your Honor.

8        THE COURT:  I think you should.

9        MR. PEARSON:  Okay.

10        THE COURT:  And both Mr. Reilly and I are on the

11 same page with that.  He's nodding.  So I think you ought to

12 get that out of the way, okay, along with the other, because,

13 even if you haven't won on the non-fraud-based issues, if you

14 win on the fraud-based, at least she'd be gone, and then the

15 Plaintiff could decide whether they want to bring anyone else

16 in, or start over, or whatever they want to do.  Okay.

17     So, yes, Ms. Parasmo, just a moment.

18     I'm not sure I want to just say her claim.  Okay?  I

19 think that what you're looking at here is a discovery into

20 how the bank evaluated her application, which apparently is

21 going to be exemplary of some numbers that were sent in by

22 the same guy, but hers, okay, and whether or not she

23 submitted fraudulent documents or otherwise made -- offered

24 some part of her application that constituted fraud, okay,

25 and I suppose whether the determination as to the sufficiency

36

1 of her application was correct, and that that could be the

2 limits.

3      If there's some other subject that would be covered by

4 that, you could tell me now or, as it came up, I guess you

5 could tell me later, and ask to expand, but this seems to be

6 what you want to look into vis-a-vis her application, and

7 then, if it turns out that it's typical, fine.  If it's not

8 typical, fine.  You can go from there, but at least you'd

9 have something to do with her.

10         Ms. Parasmo.

11         MS. PARASMO:  Yes, your Honor.  We have a motion

12 to dismiss that we're filing on Monday to dismiss the fraud

13 claim, and, frankly, it borders on Rule 11.  It's a frivolous

14 action, because I had just gotten discovery responses

15 yesterday that explain that CRB doesn't have any information

16 as to what would make it false, what would make the amount

17 that was put on her tax returns false.

18      They're saying that it's phony, it's phony tax

19 documents, but they admit in their answer and in the

20 counterclaim that they accepted, and they told people to

21 submit, draft Schedule Cs, draft tax documents, because

22 people hadn't filed their tax documents yet.

23      The Plaintiff is an attorney.  For 47 years, she has

24 been giving -- she gives seminars on banking.  She's a

25 well-respected lawyer in consumer finance.  She's worked and

37

been counsel for banks, and now they're asking for discovery
related to her deductions for her car and her auto expenses
and her mileage where she drives to Court, and under the PPP
rules, you were allowed to have a -- you were allowed to
submit a draft Schedule C, and their whole fraud is that she
submitted a phony Schedule C, when that's exactly what CRB
and the PPP program allows.

If it is fraud, your Honor, then it's not the true
reason.  It's not incomplete.  Then they didn't tell her,
"You were denied for fraud."  They denied her -- the reason,
the true reason, for denial is wrong.  And so I would just
ask if we would not have discovery, we would have a say in
discovery, pending our motion to dismiss, which we think that
the Court will dismiss this fraud complaint completely.

THE COURT:  All right.  The first point is, I have
to look at their counterclaim to see what they're saying.
First of all, if you are saying that they haven't pled a
fraud claim, that's one thing.  If you're saying that their
fraud claim really isn't true, that's not something that can
be decided on a motion to dismiss.  So I don't know what they
said.  I'd have to look at that to see what they said in
their cross-complaint, whether or not I would say, "I'm not
going to hear your motion until we have the discovery," for
example, which I could do.

Let's see.  When did you file it, Ms. Parasmo?

38

1          MS. PARASMO:  I'm filing it on Monday, because the

2     Defendants asked that we did file it after the CMC.

3          THE COURT:  Okay.  All right.  That's why I don't

4     remember when you filed it.  All right.  So it will be filed,

5     and what you've just said, which is that they tell people to

6     submit a particular type of document, that's something that's

7     outside of the complaint or the cross-claim, I think, isn't

8     it?

9          MS. PARASMO:  No.  We've pled that, your Honor,

10    and, also, that's been admitted, and that was -- sorry.

11         THE COURT:  Just a minute.  Okay.  They don't say

12    that, but what you're saying is I could take judicial notice

13    of the fact that they did that, because they admitted it in

14    your complaint?

15         MS. PARASMO:  They admitted the answer -- the

16    answer admits the allegations.

17         THE COURT:  Well, they admit it in their answer,

18    what you said in your complaint, would be clearer, but the

19    point is, ordinarily you can't consider facts outside of the

20    complaint unless they plug into some particular exception,

21    such as something the Court can take judicial notice of,

22    something that's incorporated in the complaint, et cetera,

23    and we're talking about the cross-complaint here,

24    counterclaims, or whatever, right?

25         MS. PARASMO:  Correct.

39

1          THE COURT:  All right.  So your theory is that

2    they said it's fine to submit a draft.  Well, if she

3    submitted a draft and said it was a final, that could be a

4    fraud.  If she submitted a draft, which she was entitled to

5    do, and they say, "In the draft, you've put things that are

6    clearly untrue, and you knew it, and you can't simply put

7    them in and call it a -- we're not defrauding the IRS.  I

8    will take it out then.  We're defrauding you," then, okay,

9    that could work.

10         So I do not know exactly what your theory is.  If you

11   simply said you haven't pled the false statement under Rule

12   9(b), that's one thing, but if you're simply saying what

13   they're saying doesn't fly, that I'm not sure you can really

14   do on what they've pled, and I'd have to look at it.

15         So my suggestion is, file it if you want, but I'm going

16   to defer briefing on it until the discovery has been done and

17   they move for summary judgment on their theory.  Okay?  And

18   so then it doesn't really matter whether they've got a

19   super-good complaint or not, as far as I'm concerned.  I'm

20   just going to go past the complaint, if I can, to avoid it,

21   but, if I knew more -- I mean, I could look at it, once it's

22   filed, to see whether I want to stick with this particular

23   stay.

24         It's hard for me to make a ruling on something that I

25   haven't seen.  All right?  But, even if I granted your

40

1  motion, I'd probably give them leave to amend.  Then we're

2  sitting here with, essentially, a deferred everything, and it

3  would be better if we could at least get into what they say

4  the fraud is, and actually look at it from a full-blown

5  standpoint, instead of what they may have put in their

6  counterclaims.

7       I don't know.  It's hard for me -- if you want, go

8  ahead and file it as planned, and I'll take a look at it, and

9  either say I'm deferring and staying, depending on what I see

10 that you're saying about it, or I let you go forward on it

11 simultaneously, but I'd still let discovery go forward.

12       MS. PARASMO:  Can we ask if we can have another

13 case management conference after I file the motion?  Because

14 I think it would be -- you'll be convinced that it's not --

15 it's a frivolous claim, and that the PPP regulations

16 themselves state --

17       THE COURT:  Well, you either make out your point

18 in your motion or you don't.  I don't need to hear you

19 arguing it after you file it.  It's either persuasive on its

20 merits, or it's something that looks like it ought to at

21 least give the other side a chance to respond.

22       Then you have all this briefing going on, and I really

23 want to get this one motion out of the way, and if their

24 fraud is part of it, then let's just get it out of the way,

25 too.  Mr. Pearson said, "Okay.  We don't really need it, and

1 we could wait," but I think that it just -- it slows us down.

2      Mr. Reilly, you wanted to weigh in on this, and I'll

3 let you, but you're going to have to unmute, mute, unmute.

4 Yes.  Thanks.

5           MR. REILLY:  I just wanted to interject for

6 everyone's knowledge, your Honor, that we've been around the

7 turnstile with this motion to dismiss Cross River's

8 counterclaims before.  Plaintiff filed a motion to dismiss

9 the counterclaims last summer.  We responded at great length,

10 criticizing the motion, but Plaintiff withdrew the motion

11 because she said -- over our opposition -- because she said

12 it was moot, given that she had to amend her complaint, since

13 the Court granted our motion to strike class allegations.

14      The counterclaims are unchanged from what they were

15 last summer.  We've seen these arguments before.  They're

16 very weak, and if you were to consider a renewed motion to

17 dismiss our same counterclaims, we would ask that if you are

18 considering its merits before we respond to this motion, you

19 do have in the case file our response the first time around.

20           THE COURT:  Okay.  So I'm leaving it to you, Ms.

21 Parasmo, whether you want to file that motion or not.  As it

22 stands right now, I am letting -- I am going -- I want to ask

23 you, leaving out the concern that you have that it is an --

24 they can't support a fraud claim, okay, and that it's

25 offensive to your client, who has a stellar reputation, and

42

1 it's not really right to assert fraud under those
2 circumstances that you think pertain here, if, when they get
3 through, you want to bring a cross-motion for summary
4 judgment on the fraud claim because they have no evidence,
5 you could certainly do that.

6     In other words, there could be a motion, there could be
7 a cross-motion, if you feel that there's an aspect of this
8 that has been resolved in that way, and I would let you later
9 bring a full motion for summary judgment without being barred
10 by this, assuming you keep it to the parameters we're talking
11 about.

12     Okay.  So let's see where we are.  I just don't want to
13 overlook anything in your statement.  I don't think we can
14 actually set any kind of dates in terms of trial.  We don't
15 even know what kind of trial it would be.  I think we're
16 talking about essentially having this --

17         MR. PEARSON:  Your Honor, you just went on mute.

18         THE COURT:  I hit my keyboard, and I can't -- the
19 way right now that I'm seeing you, that particular screen
20 doesn't even come up.  I have to, like -- now I can't get it
21 at all -- that's interesting -- if I want it.  Here.  Okay.
22 Fine.  Yes.  I think I just hit the keyboard, and it muted
23 me.  Okay.  Thanks.

24     So the ruling today will be that discovery can go
25 forward on the limited issues regarding the Plaintiff's

43

1 individual claim that I have set forth on the record already,

2 and I could spell those out further, but I think that you've

3 got them.

4     The next step would be a filing of a summary judgment

5 motion by the Defendant on the Plaintiff's individual claim,

6 with any defenses they have to it based on what they've

7 discovered and the Plaintiff has discovered, and then, if the

8 Plaintiff wants to file a cross-motion with respect to the

9 fraud claim, for example, or any of the other defenses they

10 raise, the Plaintiff could do that, or just oppose.

11        MS. PARASMO:  Your Honor, may I?

12        THE COURT:  Yes, I stopped.  I'm waiting.

13        MS. PARASMO:  Okay.  One of the issues for

14 discovery is how the bank evaluated her application.  I

15 understand that, under Regulation B, it's what the bank

16 regularly considers in such applications.  So are we allowed

17 to take discovery with respect to her individual claim on the

18 other applications, on actual practices?

19        THE COURT:  I think that you could take a -- you

20 could take discovery to find out what they usually do, but if

21 you start going into what they did in every single one of

22 these people's cases to try to show that they are being

23 untruthful in making their -- in giving their description,

24 either from a 30(b)(6) or other person -- I think that could

25 get very broad.

44

1    So you'd almost have to ask, I think, to perhaps take
2  one or two or three exemplary other ones, something limited,
3  not have this full-bore "Let's go into everybody and find out
4  what you did about everybody," because we're only talking
5  about this one person.  Okay?

6    If the requirements are such that they have to be
7  following a particular practice, if that is the case, then
8  you could inquire into whether they are, and if you don't
9  want to believe the person, you could decide whether you
10 would want to pick some people at random to possibly, by
11 agreement or otherwise, just pull names out of a hat or
12 something and see what they did with them.

13         MS. PARASMO:  And do we get discovery on the
14 automated system --

15         THE COURT:  What does that mean?

16         MS. PARASMO:  -- and what that did and didn't do?

17         THE COURT:  How it works?

18         MS. PARASMO:  Well, yes, and if it had any codes,
19 and how it worked, and how the processes worked through the
20 life cycle of her application, at every step.

21         THE COURT:  Well, if it's not overly burdensome,
22 probably.  I don't want to pick every single interrogatory
23 that you might pose, or request to depose somebody on, or
24 start asking them questions on a particular topic, because
25 we'll get into too many fine points, but I think, if you can

45

1 justify that the inquiry you want to make goes to the defense

2 they're raising as to her claim, then try it out and see what

3 happens.  Okay?

4          MS. PARASMO:  Thank you, your Honor.

5          THE COURT:  Okay.

6          MR. PEARSON:  Your Honor, could I just ask a point

7 of clarification?  Because I wasn't clear on whether the

8 Court was indicating that the Plaintiff could inquire as to

9 other people who applied for a PPP loan.

10         THE COURT:  Ordinarily not, but if, in fact, you,

11 for example, give her a witness to testify about how things

12 are ordinarily done -- in other words, if, in fact -- and I'm

13 not looking at the law now.  I'm making just a statement that

14 if, in fact, what they do ordinarily bears on whether or not

15 what they did in her case makes their decision proper or not,

16 okay, under whatever law they're relying on, which I'm not

17 clearly on, totally, but there seems to be an assertion by

18 the Plaintiff that you have to follow some kind of regular

19 practice, and I don't know whether that's correct.

20     If it is, and she can justify that that is the law,

21 then she ought to be able to find out if the bank did what

22 they ordinarily do in her case, and so maybe then somebody is

23 a 30(b)(6) witness who says, "I'm so-and-so, and this is what

24 we do," and explains it all, and then she's got some idea

25 that he's not being truthful, and has some hope to possibly

46

1  make that showing, and wants to pick two or three other

2  people, or whatever the number might be, to show that "You

3  didn't follow that practice, at least as to them."  And then

4  you'd have to explain why it was different.  So I don't know.

5       Anyway, you don't want to get into full-bore, but I'm

6  just thinking if there were -- you could look at, maybe, a

7  couple or three or something.  I'm not saying you can do it.

8  I'm saying it might be proper, but you'd have to justify it

9  specifically.  You couldn't just look at these other people

10 and what they did, and bring in everybody, because we're just

11 looking at her.  Okay.

12      I'm trying to make it as narrow as I can, but there may

13 be instances where someone would say, "Gee.  You know, this

14 guy really said X, Y, and Z, and they haven't been able to

15 produce A, B, C, and so we really think, if we could show

16 that you do it a few other times, that would show that this

17 isn't their practice."  I don't know if that would even work,

18 or if you just ended up with three outliers.  I'm not sure.

19 Okay.

20           MR. PEARSON:  Thank you, your Honor.

21           THE COURT:  Maybe it's just -- it's not enough,

22 what you did, and that's their opposition to your motion.

23           MR. PEARSON:  That clarification is helpful.

24 Thank you.

25           THE COURT:  Okay.  I hope this works, and it

47

1  doesn't just become another instance of my saying to some --

2  allowing something, and then saying in the next case, "Sorry.

3  You can't limit it at time reports (sic)."

4      So I hope it works, and when you would file your

5  summary judgment motion -- a little hard for me to give you a

6  date, because I don't know how long your discovery would

7  take, but maybe I ought to set, so you don't drop off the

8  face of the earth, a further status conference date, and if

9  that turns out to be premature, that you jointly give me a

10  request on good cause that, you know, you're not ready to do

11  it yet, "We're still working on" whatever I said you could do

12  that would save time and is -- okay.

13      So you want to give me just -- throw out some kind of a

14  time frame?  Are we taking 90 days, 120 days, whatever, to

15  come back, less than that?

16          MR. PEARSON:  Your Honor, we had proposed a

17  deadline for motions of September 15th.

18              THE COURT:  To file the motion.

19          MR. PEARSON:  Right.  So I don't know whether that

20  is a good deadline -- or good date for a CMC, or whether

21  you're like to do it earlier in the summer.

22              THE COURT:  Well, it would have to -- I was just

23  trying to set one after you filed your motion, and if you

24  hadn't file it, I just wanted to find out what was going on.

25              MR. PEARSON:  Right.

48

1          THE COURT:  Did you jointly propose this, or just
2  you?  I'd have to go back and look.
3          MR. PEARSON:  I think that was our proposal, your
4  Honor.  The Plaintiff, I think, wanted to have a more -- a
5  broader scope of discovery.
6          THE COURT:  Okay.
7          MR. PEARSON:  Yes.
8          THE COURT:  So, if I'm allowing you to do this,
9  and we are in, let's just call it, mid-March, okay, you're
10 talking six months before you would file.  It shouldn't take
11 you six months to get this limited discovery, it would seem
12 to me, done, and I think the best thing for me to do is not
13 set a date for you to file the motion, but a date by which
14 I'd like to know, if you haven't filed it, what's going on.
15         MR. PEARSON:  Okay.
16         THE COURT:  So what would that be?  Because I
17 don't think it should take you six months to file a motion,
18 when you're saying this is all going to save us time on
19 discovery.  So maybe 120 days?
20         MR. PEARSON:  Okay.
21         THE COURT:  I don't know.  I'll say that.  Okay.
22 So what is that?  Hang on.  I guess we're looking at
23 mid-July.  Are you going to be around in the middle of July,
24 or are you going somewhere?
25         MR. PEARSON:  I actually need to check, your

49

1  Honor.  I am still struggling with these electronic

2  calendars.  I stuck with a paper calendar forever.  Your

3  Honor, I have -- it looks like I will be out of town the week

4  of the 17th.

5          THE COURT:  Okay.  How about, Mr. Reilly, have you

6  looked?

7          MR. REILLY:  I have, your Honor.  I have, your

8  Honor.  I would be available except for the week of the 3rd.

9          THE COURT:  Okay.  What about you, Ms. Parasmo?

10         MS. PARASMO:  The week of the --

11         THE COURT:  Something in July.  I'm just looking

12  at July.

13         MS. PARASMO:  The week of the 17th looks better

14  for me.  I may be out of the country.

15         THE COURT:  When?  I mean, I'm sorry.  You're

16  going to be -- maybe we ought to say that 28th.

17         MS. PARASMO:  That would be better.

18         THE COURT:  Are you going to be --

19         MS. PARASMO:  Yes.  That would be better.

20         THE COURT:  How about you?  Have you found your

21  paper calendar yet, Mr. Pearson?

22         MR. PEARSON:  Well, I --

23         THE COURT:  It's pretty clear, if he were doing

24  the bank's work, that they weren't relying on a --

25         MR. PEARSON:  I am scheduled to be out of town on

50

1  the 28th, your Honor.  If it's by Zoom, I think I probably

2  could still do it, if needed.  Do you have these conferences

3  only on Fridays, your Honor?

4          THE COURT:  Yes.  I mean, we can keep going.  If

5  I'm running out of July, I can say August 4, with a statement

6  by the 28th, and you could be out of town and already got the

7  statement together, and Mr. Reilly could fly in.

8          MR. PEARSON:  Okay.  Yes.  Your Honor, I am

9  scheduled to be on vacation on the 4th.  I could do the --

10  I'm sorry, your Honor.  I could do the 21st, I could do the

11  14th, and I could do the 7th.

12          THE COURT:  Okay.  Everybody look at the dates and

13  see if any of those work for you.  If they don't, I'm not

14  sure what to do.

15          MR. PEARSON:  That is 75 percent of the Fridays in

16  July.

17          MR. PEARSON:  July 21st sounds good.

18          THE COURT:  Fun to go.

19          Mr. Reilly?

20          MR. REILLY:  Yes.  Yes, your Honor.  That's fine.

21          THE COURT:  Okay.  We got a date.  All right.

22  Fine.  This matter will stand over to July 21 at 10:30 for a

23  status conference, we'll say.  Statement would be due by -- I

24  guess that's the 14th, if my remedial math fits with the

25  chambers properly, and I don't think we do anything else, but

51

1  I'm hoping that this will work with the parameters.  But, you

2  know, if it doesn't, my mistake.  Okay.  So I think that's

3  all, but you have me now.  So, if there's anything further,

4  tell me.  Otherwise, we're going to end the conference.

5          MS. PARASMO:  No, your Honor.

6          MR. PEARSON:  Nothing from us, your Honor.

7          THE COURT:  That's it?  Okay.  All right.  I want

8  to take this opportunity to thank you, by the way.  This is

9  a -- it's a very good statement.  Just because, you know, you

10 didn't give me a chambers copy -- it's a very good statement.

11    I want to take this opportunity to thank Ms. Scott for

12 graciously filling in for Ms. Geiger (phonetic), our

13 courtroom deputy clerk who is ordinarily with us.  Ms. Scott

14 has had a very busy time filling in for Ms. Geiger on a

15 variety of matters, including this one.  Ms. Geiger will be

16 back on Monday.  So, Ms. Scott, thanks very much, and,

17 Counsel, I hope you have a nice weekend.

18    This completes this conference.  We are in recess.

19         THE CLERK:  Thank you, your Honor.

20         MS. PARASMO:  Thank you, your Honor.

21         THE COURT:  Thank you.

22         MR. PEARSON:  Thank you very much, your Honor.

23         THE COURT:  Thank you.

24         MR. PEARSON:  Have a great weekend.

25         THE COURT:  Thank you.  Goodbye, everyone.

52

1          THE CLERK:   Goodbye.

2          THE COURT:   Goodbye.

3      (Proceedings concluded at 12:13 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

## CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Friday, April 7, 2023